UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Joseph Jackson,

                              Plaintiff,

     v.

M. Stack,

                              Defendant.

**Report and Recommendation**

16-CV-1041A

---

## I. INTRODUCTION

Plaintiff Joseph Jackson ("Jackson") is a New York state inmate who currently is housed at Watertown Correctional Facility but was housed at Attica Correctional Facility in 2016. According to the complaint (Dkt. No. 1), filed *pro se*, Jackson had several encounters with corrections officer Michael Stack ("Stack") in 2016 that led to administrative grievances and this lawsuit. The encounters seemed to concern two issues: visitors who would come to see Jackson; and Jackson's desire for "a shower after I was done working, sweeping and mopping the halls and taking out trash which is unsanitary." (*Id.* at 5; *see also* Dkt. No. 30 at 41, 48–52 (summary of grievances over work showers).) Following initial screening, the sole claim that survived was a First Amendment retaliation claim against Stack; the alleged retaliation consisted of the denial of work showers, the denial of phone calls, and the filing of false disciplinary reports that Jackson calls "false grievances." (Dkt. No. 6.)[1]

Stack now has filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 39.) Stack argues that Jackson always had full privileges under prison

---

[1] For the sake of the record, the Court notes that the screening order gave Jackson the opportunity to revive some of his claims through an amended complaint. The docket does not show that Jackson elected to file an amended complaint.

policy and to the extent that disciplinary proceedings for his misbehavior permitted. Any privileges denied to Jackson, according to Stack, were privileges requested beyond what is available under prison policy. Stack argues further that no retaliation occurred with respect to Jackson's work duties. The work duties took little time, by Jackson's own admission, thus making extra showers unnecessary. Additionally, Jackson had no right to continue in the particular work position that he had.

Following an appropriate *pro se* notice and two extensions of time totaling nearly three months, Jackson did not file responding papers.

District Judge Richard J. Arcara has referred this case to this Court under 28 U.S.C. §§ 636(b)(1)(A) and (B). (Dkt. No. 9.) The Court has deemed the pending motion submitted on papers under Rule 78(b). For the reasons below, the Court respectfully recommends granting Stack's motion.

## II. BACKGROUND

Because Jackson did not elect to file an amended complaint, the core of this case remains where it was after initial screening. The initial screening order described Jackson's sole claim against Stack as follows:

> Plaintiff alleges Defendant Stack retaliated against him because Plaintiff filed grievances against him. Plaintiff contends Stack's retaliatory actions include denying Plaintiff showers after work and before a visit, denying him a phone call, and filing misbehavior reports "accusing him of writing false grievances," which he claims caused him to be removed from his work program. (Docket No. 1, p. 6.) Plaintiff argues Stack's actions were further motivated by a then-pending lawsuit against other officers, of which he claims Stack was aware. On these facts, specifically with respect to Plaintiff's allegations that Stack's misbehavior reports accused Plaintiff of writing false grievances and terminated him from his work program, the Court finds Plaintiff's allegations sufficient to proceed to service on Defendant Stack.

(Dkt. No. 6 at 5.) On June 15, 2018, Jackson filed his own motion for summary judgment, a motion that eventually was denied. Jackson's motion papers contained a statement at the beginning that summarized his view of the case and added some context to his allegations:

2

> The genuine issue in this case is that plaintiff wrote grievances on the defendant M. Stack, who was his boss at the time of the incidents, about being denied work showers after cleaning unsanitary places and being denied a courtesy visiting shower after being harassed about his visits . . . , and in retaliation of plaintiff writing grievances on defendant M. Stack. Defendant Stack in retaliation of plaintiff writing grievances against him fired plaintiff and wrote 2 inmate counseling notifications against him.

(Dkt. No. 16 at 2–3.) Jackson concluded his motion papers with a request for punitive and compensatory damages along with "an injunction posting a memorandum (in Attica Correctional Facility) stating B-Block porters' entitlement to showers after work and [the] gallery phone if they miss recreation because they had to work, expunge the plaintiff's removal for poor performance off of his record, and move plaintiff to Collins Correctional Facility immediately." (*Id.* at 7–8.)

Since initial screening and Jackson's motion, a factual record has developed that permits closer review of his allegations. Of greatest interest to the Court, since Jackson is the party adverse to the pending motion, is the transcript of Jackson's deposition. Jackson's deposition occurred on November 20, 2018. To bolster his assertion that a Sgt. O'Connell helped Stack retaliate against him, Jackson testified that "they both were working at Attica for decades—over a decade together so they knew each other. And, you know, as correctional officers, when you're friends with other correctional officers, you—you— you fraternize, you socialize." (Dkt. No. 39-4 at 9.) Jackson testified that, regardless of official responsibilities or duties, Stack could have influenced where he would be housed by virtue of his tenure as a corrections officer. (*Id.* at 12.) With respect to his transfer from Attica Correctional Facility to Coxsackie Correctional Facility and then Bare Hill Correctional Facility—one of the ways in which retaliation purportedly occurred—Jackson conceded that he filed a preference before August 2016 to be housed in a medium-security prison.[2]

---

[2] Attica is an A-level maximum facility; Coxsackie is a B-level maximum facility; and Bare Hill is a medium facility.

(*Id.* at 15.) With respect to work showers, Jackson testified that "I felt that you were entitled to one, and I remember reading it in black and white in the beginning of my bid. And even if that wasn't the case, I was still challenging the policy if it wasn't." (*Id.* at 23.) Jackson conceded that the Attica Facilities Operation Manual permitted inmates to have three showers a week—one more than had been posted on the regular schedule but with no connection to work assignments. (*Id.* at 28.) With respect to telephone usage, Jackson's testimony uncovered what the heart of the problem seems to have been: Telephone usage followed a schedule that conflicted with his work schedule. (*Id.* at 30–31.) Jackson conceded, though, that telephones were not available anytime upon request. (*Id.*) Jackson asserted that the Attica inmate orientation manual stated that inmates could receive a shower upon any visit, and that he was receiving visitor showers until he wrote a grievance against Stack. (*Id.* at 32–34.) Jackson asserted that making false statements against corrections officials does not constitute harassment. (*Id.* at 38.) Jackson testified that Stack made up the charge of cleaning his cell without permission, though he did not file a grievance over the charge. (*Id.* at 45.) Jackson did concede that inmates are permitted to clean their cells only during posted times. (*Id.* at 46.) Jackson was removed from his work positions because he received over 30 days' worth of penalties at one point. (*Id.* at 51.) According to Jackson, working as a porter took only about 10 to 15 minutes per day. (*Id.* at 55.)

Other information appears in the record as well. Stack himself denies working with Sgt. O'Connell to retaliate against Jackson in any way. "While I know of Sgt. O'Connell, he is one of hundreds of officers who worked at Attica. I have never served with him and do not socialize with him. I have never discussed any lawsuit brought by Joseph Jackson with him . . . . Inmate Jackson was not assigned as a B Porter until March 2016—or more than two years after the claims against O'Connell were dismissed—and he served as a porter for five months before he ever claimed that I

4

retaliated against him because of another lawsuit." (Dkt. No. 39-6 at 2.) Stack also provided context for a range of issues including the issue of showers:

> Inmate-porters are not afforded additional showers as of right. They sweep floors, deliver meals, and empty waste-paper baskets and, except in unusual, extenuating circumstances, do not require a shower after working each day. Plaintiff is a perfect example of this. He admits he worked between 15 and 20 minutes per day and on July 29, 2016. As such, he did not need an additional shower. Allowing inmate-porters to take showers after 15- to 20-minutes of work would present logistical problems and raise security concerns for supervising officers. Inmate-porters finish their assigned jobs at different times; additional officers are not available to supervise the inmate-porters in the shower; and I could not supervise porters who were still working while simultaneously supervising both inmates locked in their cell and inmates in the shower. For all of these reasons, on July 29, 2016, I denied inmate Jackson's request to take a "work shower."
>
> * * * *
>
> I also understand that plaintiff claims that I denied him a "visitation shower" on August 4, 2016 because he complained to my superiors about me denying him a work shower. This, too, is manifestly false. Just as with work showers, there is no such thing as a "visitation" showers and inmates are not entitled to them. For these reasons and the reasons discussed above, I denied inmate Jackson a "visitation shower" on August 4, 2016.
>
> Inmate Jackson's situation provides ample reason why inmates are not allowed additional showers merely because they enjoy visitation privileges. By inmate Jackson's account, he received visitors three to five times per week, every week. He received two company showers per week and believed erroneously that he was entitled to a work shower every day he worked (or five times a week). If Jackson were allowed work and visitation showers, he would be taking approximately 10 to 12 showers per week. This is more than one shower per day and, indeed, 5 to 6 times the number of showers afforded other inmates on a weekly basis. Indeed, it is likely more showers than most civilians take per week.

(*Id.* at 4–5.)

Stack filed the pending motion on February 19, 2019. Stack denies retaliation altogether. Additionally, Stack emphasizes that the adverse actions that Jackson has alleged are only denials of additional privileges that no other inmate receives. Stack notes that the alleged adverse actions comprise the denials of two extra showers and of telephone use, all outside of regular schedules.

Stack argues that Jackson has not alleged the deprivation of any existing privileges in violation of facility policy.  Stack also emphasizes that the passage of time weakens Jackson's argument that Stack retaliated against him in 2016 for a lawsuit that Jackson filed against Sgt. O'Connell in 2013.  With respect to any allegations about retaliation for filing grievances, Stack emphasizes that "plaintiff did not follow DOCCS' grievance procedures as to his claim that CO Stack had him removed from the porter position for retaliatory reasons.  Indeed, he failed to follow the process and exhaust his grievance in myriad ways." (Dkt. No. 39-2 at 15.)  Finally, Stack argues that inmates do not have a right to any particular job in a facility.  To the extent that Jackson has alleged retaliation by way of removal from his porter job, Stack responds that job transfers are discretionary and that Jackson would have been removed anyway for repeated instances of misbehavior.  "This included misbehavior reports for drug use, possessing a weapon at Sing Sing Correctional Facility, unreported illness, assault on an inmate, possessing a weapon at Auburn Correctional Facility, alcohol use or intoxication at Southport Correctional Facility, violent conduct at Clinton Correctional Facility, creating a disturbance, fighting at Clinton, altering a state item, tattooing, violent conduct and fighting at Great Meadow Correctional Facility, alcohol use at Great Meadow, drug use at Attica, and a visitation violation at Attica." (*Id.* at 21 n.12.)

When Stack filed and served his motion, he included the required notice to *pro se* litigants regarding summary-judgment motions.  (Dkt. No. 39 at 2.)  The Court mailed Jackson a copy of the initial scheduling order for the motion.  (Dkt. No. 40.)  The Court knows that Jackson received the schedule because he asked for extensions twice.  (Dkt. Nos. 42, 44.)  The Court granted both requests for extensions, giving Jackson through June 14, 2019 to respond.  (Dkt. No. 45.)  Even after considering the rest of the month of June 2019 as a grace period to account for the vagaries of the prison mail system, Jackson did not file responding papers.

## III. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "Where, as here, the nonmovant would bear the burden of proof at trial, the movant may show prima facie entitlement to summary judgment by either (1) pointing to evidence that negates its opponent's claims or (2) identifying those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (summary order) (internal quotation and editorial marks and citation omitted).

Here, Stack has satisfied his burden of showing no genuine dispute as to material facts. The Court is mindful that inmates like Jackson often are at a disadvantage during pretrial discovery. "While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his

7

own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted). Nonetheless, Jackson at his deposition could not identify any specific event that would support his allegation that Stack and Sgt. O'Connell collaborated against him. *Cf. Kotler v. Boley*, No. 17-CV-239 (KMK), 2018 WL 4682026, at *5 (S.D.N.Y. Sept. 28, 2018) ("In any event, in the absence of specific and detailed factual allegations that Boley and Carreras filed these reports in retaliation, the Court approaches this claim with skepticism and particular care and thus dismisses the due process claims against them.") (internal quotation marks and citations omitted); *Suarez v. Kremer*, No. 03-CV-809, 2008 WL 4239214, at *10 (W.D.N.Y. Sept. 11, 2008) ("In the instant matter, Suarez's claims are conclusory, vague and amorphous. The plaintiff points to no specific incident from which the remaining alleged conduct from the defendants is alleged to emanate. The record reflects that Suarez has a poor disciplinary record and the plaintiff has not demonstrated that he has been vindicated in administrative hearings. As reflected in the plaintiff's deposition testimony, Suarez asserts only wholly conclusory and self-serving allegations of a conspiracy to retaliate against him."). Jackson's only basis for his belief about Stack and Sgt. O'Connell is a broad assertion that corrections officers socialize. Jackson conceded that he filed a preference before August 2016 to be housed in a medium-security prison, meaning that any subsequent transfers would have been consistent with his stated wishes. Jackson made further concessions at his deposition as well: His porter job took only about 15 minutes to complete per

day, a duration that a reasonable jury would have a hard time viewing as particularly strenuous or dirty; showers and telephone calls occurred in accordance with posted schedules; and his work removals were connected to receiving over 30 days of punishment for misbehavior. Cleaning of cells also followed a schedule. "Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion." *Hare v. Hayden*, No. 09 CIV. 3135 RWS, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citations omitted). Under these circumstances, no reasonable jury would find that any interaction between Jackson and Stack fell outside the ordinary range of prison management. Summary judgment thus is appropriate.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Stack's motion for summary judgment. (Dkt. No. 39.)

## V. OBJECTIONS

A copy of this Report and Recommendation will be mailed to plaintiff by first-class mail, and sent to counsel by electronic filing, on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system (or mailed timely, in Jackson's case).

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002)

("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

                                              __/s Hugh B. Scott_____
                                              Hon. Hugh B. Scott
                                              United States Magistrate Judge

DATED: July 9, 2019